**In re Charles LURIA, Debtor.**

**Bankruptcy No. 94–1–2553–DK.**

United States Bankruptcy Court,
D. Maryland.

Dec. 13, 1994.

Bradley R. Duncan, Fairfax, VA, for Crestar Bank.

John R. Garza, Rockville, MD, for debtor.

## *MEMORANDUM OPINION*

DUNCAN W. KEIR, Bankruptcy Judge.

This court has before it a Motion To Prohibit The Use Of Cash Collateral filed by Crestar and the Debtor's Response thereto.

Both parties have submitted supplemental memoranda which this court also has considered. At the preliminary hearing, Crestar's motion was denied due to insufficient evidence upon which this court could find that the funds at issue were Crestar's cash collateral. In addition to the cash collateral motion, Crestar has asked this court to determine whether the funds, derived from a Personal Services Consulting Agreement, are property of the Debtor's estate.

The relevant facts are as follows:

In 1991, Crestar obtained judgments totalling $1,831,382.06 against the Debtor. On February 3, 1992, the Debtor caused two partnerships, Charles Luria Associates, Inc. (hereinafter "CLAI") and Charles Luria Associates Limited Partnership (hereinafter "CLALP") to pledge their 99% partnership interest in PQIA Limited Partnership as collateral for the judgments. CLAI and CLALP executed assignment agreements. At that time, PQIA was the owner of a 635 room luxury hotel in Arlington, Virginia. On September 2, 1993, PQIA filed a Chapter 11 petition in the Eastern District of Virginia. PQIA and Compris/Arlington Hotel Co. ("AHC") presented a joint Plan of Reorganization that was confirmed on March 16, 1994.

The relevant terms of PQIA's Plan of Reorganization included the transfer of ownership of the hotel to AHC; an $80,000.00 cash contribution by AHC for distribution to unsecured creditors; the termination of PQIA; the cancellation of the outstanding equity interests of CLAI and CLALP; and the execution of a Personal Services Consulting Agreement between the Debtor and Doubletree Hotel, the successor to the hotel under PQIA's confirmed plan of reorganization.

According to the terms of the Personal Services Consulting Agreement executed on May 16, 1994 (the same day Debtor filed his Chapter 11 petition in this case), the Debtor was to perform consulting services for Doubletree.

The Agreement contains the following relevant provisions:

1. *Consultant's Services.* From time to time upon Owner's or Manager's written request, Consultant shall advise Owner or

Manager, as applicable, about existing and anticipated market conditions for hotels in the Washington, D.C. metropolitan area. Consultant shall not be required to, and shall not, perform any services under this Agreement except upon the express prior written request of Owner or Manager. Consultant shall not be required to devote more than ten (10) days in any calendar month nor more than eight (8) hours in any day to providing such services. Consultant shall have the right, subject to Owner's and Manager's reasonable convenience, to determine the days and times for performance of any requested services. Consultant's advice may be oral or written, as he deems appropriate, and shall be conveyed to Owner or Manager at the Hotel or at another mutually-convenient location in the Washington, D.C. metropolitan area. Neither Owner or Manager shall have any obligation to act on any advice so provided by Consultant.

3. *Consulting Fee.*

(a) In consideration of Consultant's performance of the services described in Section 1, Consultant shall be paid a monthly consulting fee (the "Consulting Fee"), payable in arrears, as follows: (i) Twenty–Two Thousand Five Hundred Dollars ($22,500) per month during the first year of the Term, (ii) Twenty–One Thousand Two Hundred Fifty Dollars ($21,250) per month during the first six months of the second year of the Term, (iii) Eleven Thousand Two Hundred Fifty Dollars ($11,250) during the second six months of the second year and the entire third year of the Term, (iv) Ten Thousand Four Hundred and Sixteen Dollars and Sixty–Seven Cents ($10,-416.67) per month during the fourth and fifth years of the Term, and Ten Thousand Eight Hundred and Thirty–Three Dollars and Thirty–Three Cents ($10,833.33) per month during the sixth through tenth years of the Term. The first installment of the Consulting Fee shall be paid on the first business day of _____, 1993 [insert month following signing], and the remaining payments shall be made on the first business day of each succeeding month during the Term.

(b) In order to ensure the full and prompt payment when due of the Consulting Fee, Manager hereby sells, assigns, transfers and delivers to Consultant, Manager's right, title and interest in and to that portion of the management fee earned by Manager under and pursuant to the Management Agreement that constitutes (i) the Base Fee (as defined under the Management Agreement) and (ii) an additional amount sufficient to pay in full the Consulting Fee, which additional amount shall be paid to Consultant without deduction for any costs or expenses, and before any amounts are paid to Manager. All amounts assigned by Manager hereunder will be paid directly by Owner to Consultant, at the address set forth in Section 13 hereof, or at such other address as Consultant may from time to time in writing direct.

(c) The assignment described in Section 3(b) (the "Assignment") shall terminate and be of no further force and effect upon the first to occur of: (i) a termination of this Agreement pursuant to Section 9 hereof; and (ii) termination of the Management Agreement.

(d) If the Assignment has been terminated pursuant to clause (ii) of Section 3(c), or if amounts earned by Manager under the Management Agreement are insufficient to pay in full the Consulting Fee, the Consulting Fee, or any deficiency therein, shall be paid by Owner, when due, in the same amounts as set forth in Section 3(a).

8. *Default by Owner or Manager.* In the event that Consultant shall not have received the Consulting Fee when and as due, and such failure shall not have been cured prior to the tenth (10th) day of the month in which such payment is due, Consultant shall be excused from rendering any further services pursuant to this Agreement until all amounts owing to Consultant, together with interest on such sums from the date due to the date of payment at a rate equal to the prime lending rate being charged by Sumitomo at that time, have been paid. If the default in payment by Owner or Manager shall continue unremedied for sixty (60) days, the net present value of all amounts owing

in respect of the Consulting Fee hereunder shall immediately be due and payable. The aforesaid right and privilege of Consultant to withhold services shall be in addition to any and all other remedies available hereunder or at law.

9. *Default by Consultant.* In the event that Consultant shall (a) fail to provide the services described in Section 1 above (for any reason other than the medical disability of Consultant for a period not to exceed six (6) months) and such failure shall continue for sixty (60) days after written notice thereof from Owner or Manager to Consultant, or (b) willfully default in the performance of any other material obligation of Consultant hereunder, and such failure shall continue for five (5) days after written notice thereof from Owner or Manager to Consultant, then, in any such event, Owner and Manager, or either of them, shall have the right to terminate this Agreement, including the privileges described in Sections 5 and 6 hereinabove, at which time Consultant's right to receive the Consulting Fee shall terminate, and no further amounts shall be due from Owner or Manager to Consultant.

10. *Permissible Activities.* Nothing herein shall in any way preclude Consultant from engaging in any business activities or from performing services for its own account or for the account of others.

The Personal Services Consulting Agreement was executed by the Debtor and Compris in accordance with a global settlement, which resolved bankruptcy, as well as other, pending litigation. The Settlement Agreement contains recitals that outline the relevant facts and the desire of the parties "to settle and resolve the disputes between the Luria Parties, on the one hand, and Sumitomo and Compris, on the other, on the terms and conditions set forth below and to consummate a transaction by which all direct or indirect interest of Luria or any affiliate of Luria in PQIA shall be extinguished upon consummation of a Chapter 11 plan of reorganization for PQIA." In one paragraph of the 17 page document, the parties outlined a monthly payment schedule pursuant to the Consulting Agreement currently at issue.

Crestar argues that the Personal Services Consulting Agreement constitutes property of the estate because the payments contemplated under the Agreement were proceeds of the pre-petition "sale" of Debtor's interest in PQIA. The Debtor disagrees and characterizes the payments as compensation from services performed after the filing of the petition. If the payments pursuant to the agreement are received as compensation for services performed, then the funds are not property of the estate. 11 U.S.C. § 541(a)(6). On the contrary, if the payments are funds generated from rights surrendered by the Debtor herein, as a part of his global settlement with Sumitomo and Compris in the PQIA case, then such payments would be property of the estate.

■ Debtor argues that the confirmation of PQIA's Plan of Reorganization, including the approval of the Personal Services Consulting Agreement, precludes Crestar from objecting to the Agreement as a personal services contract. This argument is without merit. Although the Bankruptcy Court for the Eastern District of Virginia did confirm PQIA's Plan, to which Crestar had no opposition, that court neither addressed nor decided the issue presently before this court concerning the estate of Debtor herein.

Although Debtor argues vehemently that 11 U.S.C. § 1141 and the principles of *res judicata* prohibit this court from revisiting the issue of the personal services contract, the issue of whether the Personal Services Consulting Agreement is property of the estate pursuant to 11 U.S.C. § 541 became ripe for adjudication only upon the filing of this Chapter 11 petition. The commencement of a case creates an estate. 11 U.S.C. § 541(a). The Debtor's estate was created on May 16, 1994, two months after the Order confirming the PQIA Plan. Crestar is not precluded from challenging the Debtor's characterization of the consulting agreement as an asset exempted from the estate.

■ A debtor's estate is compromised of all legal or equitable interests of the debtor in property as of the commencement of the case, 11 U.S.C. § 541(a)(1), including proceeds, product, offspring, rents or profits of

or from property of the estate except such as are earnings from services performed by an individual debtor after commencement of the case, 11 U.S.C. § 541(a)(6). "The earnings exclusion created by § 541(a)(6) was intended to be a very narrow and specific exception to the otherwise all-inclusive definition of property of the estate contained in § 541(a)." *In re Carson,* 82 B.R. 847, 851–52, (Bankr. S.D.Ohio 1987) (citing *In re Fitzsimmons,* 20 B.R. 237, 239 (9th Cir. BAP 1982)). The determinative issue is whether such payments accrue from the Debtor's post-petition services. *Id.; In re Andrews,* 153 B.R. 159 (Bankr.E.D.Va.1993).

▮ "When considering rights to future payment the court must strike a balance between the necessity of dedicating assets to the satisfaction of pre-bankruptcy debt and giving the debtor an opportunity for a fresh start unhampered by the pressure and discouragement of pre-existing debt." *In re Andrews, supra* at 162. "When an asset is 'sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start' it should be regarded as property of the estate." *Id.* (citing *Segal v. Rochelle,* 382 U.S., 375, 380, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966)).

▮ After a review of the Personal Services Consulting Agreement and the Settlement Agreement executed by the Debtor and Sumitomo/Compris, this court finds that the payments and the Consulting Agreement are property of the estate. In determining whether or not the consulting agreement was for services performed by the Debtor after his bankruptcy was filed, this court is not constrained to follow the label which the parties put upon the document. "The label ... placed on the earnings ... does not substitute for the requirement that they be actually earned for personal services." *In re Armstrong,* 73 B.R. 143, 145 (Bankr.N.D.Tex. 1987). The parties executed the consulting agreement as a part of a Settlement Agreement between the Debtor and certain creditors in the PQIA bankruptcy, Sumitomo Bank and Compris. Mr. Luria obtained his rights to the payments embodied in the "Consulting Agreement" clearly as a *quid*

*pro quo* for his execution of the Settlement Agreement.

As consideration for the relinquishment of its state court action and resolution of the PQIA bankruptcy, Sumitomo/AHC acquired ownership of the hotel, which had been the principal asset of PQIA, through the Plan of Reorganization. In exchange for a similar relinquishment of rights, including the transfer of the hotel, Charles Luria, Debtor herein and the principal owner of PQIA, received a $1,500,000.00 payout over 10 years under the consulting agreement.

In *Andrews,* the court addressed an analogous situation. The debtor therein had executed a non-competition agreement in conjunction with the sale of the tangible assets of his business. *Andrews* at 164. Although the non-competition agreement was a separate document with allegedly separate consideration, the court found as follows:

> "[i]f not for the sale of the business in this case there would not have been a non-competition agreement. In fact, the sale of the business was expressly conditioned upon Andrews entering into a non-competition agreement ... the non-competition agreement is inexorably intertwined with the asset sale agreement ... and was merely ancillary to the sale of a going concern."

*Id.*

Adopting the same reasoning, this court finds that the execution of the consulting agreement, one part of an overall settlement, was inexorably intertwined with the transactions of the negotiating parties. The Debtor has stated that approval of the consulting agreement was essential to the settlement. These circumstances alone give rise to the inference that Mr. Luria's payments were not dependent upon or consideration for actual performance of services.

Additionally, upon consideration of the terms of the consulting agreement, the court is convinced that the consulting agreement and payments thereunder are property of the estate because the Debtor is not compensated for services actually rendered. The Debtor is not required to perform any particular services. In addition, the requirement that

the Debtor hold himself available to consult as called upon imposes very little burden upon the Debtor. The agreement specifically does not restrict the Debtor from engaging in any competitive business to that conducted by Doubletree/AHC. As an asset of the estate, the consulting agreement would not hamper the Debtor's opportunity to make a fresh start. To the contrary, the Debtor may obtain other employment.

The compensation provided under the Agreement does not correlate to the performance of any services. The Agreement provides a front-loaded payment structure, wherein the Debtor will receive $600,000.00 in the first three years, including a $270,-000.00 payout in the first year. Monthly payments are not tied to the amount of services which the Debtor was called upon to render, or any particular hours or results from the Debtor's efforts. Furthermore, the testimony evidenced that the Debtor has not been called upon to perform any services under the agreement, but is being paid under the consulting agreement according to the fixed fee schedule without rendering any services.

Clearly the substance must rule over the form. The consulting agreement does not represent any contract for payment for services rendered by the Debtor after his petition in bankruptcy, but compensates the Debtor for that which he gave up in the Settlement Agreement between Debtor, Debtor's entities, Sumitomo and Compris as executed in PQIA's Plan of Reorganization. The right to receive payments under the consulting agreement having been earned by the settlement in the PQIA case, before the Debtor filed his individual petition, the right to be paid and the payments from the consulting agreement are property of the estate in his bankruptcy.

The court must next determine whether the Personal Services Consulting Agreement constitutes Crestar's cash collateral. Crestar argues that the Personal Services Consulting Agreement is proceeds of the collateral which it held prior to the confirmation of the PQIA plan. Further, any payments received under the agreement would be proceeds of proceeds. Crestar held

a security interest in the stock of CLAI and CLALP which in turn owned a 99% interest in PQIA. The stock owned by CLAI and CLALP in PQIA was canceled by the PQIA plan, in accordance with the Settlement Agreement. Crestar argues that the payments from the consulting agreement are, in effect, installment payments for that stock interest, over which it held a security interest. Thus, Crestar labels the consulting agreement as proceeds for the stock over which it had a pledge. In opposition, the Debtor again argues that Crestar is precluded from relitigating any issue which could have been litigated in the PQIA bankruptcy.

"Cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, off-spring, rents or profits of property subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case. 11 U.S.C. § 363(a). If the court finds that the agreement is proceeds of the security interest in the collateral, then it constitutes cash collateral and Crestar is entitled to adequate protection. The court may prohibit or condition the debtor's use of the funds. 11 U.S.C. § 363(e). "Proceeds" include whatever is received upon the sale, exchange, collection or other disposition of the collateral. Md.Code Ann.Comm.Law I section 9–306 (1992).

At first blush, Crestar's argument appears meritorious. The Debtor "disposed of" the stock interest in CLAI and CLALP, and simultaneously resolved pending disputes with Sumitomo/Compris and executed a Personal Services Consulting Agreement. Crestar characterizes the disposition of the collateral as a sale; however, the treatment of the stock of CLAI and CLALP was determined by the Order of Confirmation in the PQIA bankruptcy. Crestar, therefore, is precluded from relitigating questions necessary and actually determined by the United States Bankruptcy Court for the Eastern District of Virginia in entering its Order of Confirmation.

As stated in the plan confirmed by the court in the PQIA case, "the Old Partnership Agreement (defined as the 5th Amended and Reinstated Agreement and Certificate of Limited Partnership of Pentagon Q.I. Associates Limited Partnership ..., ... by and among Charles Luria Associates, Inc., Charles Luria Associates Limited Partnership and Compris) shall terminate and the Debtor shall liquidate and dissolve and shall continue to exist solely for the purpose of administering its obligations under this plan and the Bankruptcy Code." In addition, the interests of CLAI and CLALP were classified and treated in Class 5. These Class 5 interests "shall receive or retain no property under this plan on account of their interests."

■■■ The provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan. 11 U.S.C. § 1141(a). "Subject to compliance with the requirements of due process under the Fifth Amendment, a confirmed plan of reorganization is binding upon every entity that holds a claim or interest even though a holder of a claim or interest is not scheduled, has not filed a claim, does not receive a distribution under the plan, or is not entitled to retain an interest under such plan." 5 L. King, *Collier on Bankruptcy*, § 1141.01[1] at 1141–6 (15th ed. 1994). Once the plan is confirmed, all questions which could have been raised pertaining to such plan are *res judicata*. *In re Linkous*, 990 F.2d 160, 162 (4th Cir.1993).

■■■ The Supreme Court has concluded that, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (citing *Mullane v. Central Hanover Bank &*

*Trust*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted)).

There is no dispute that Crestar had notice of the PQIA bankruptcy. Crestar was scheduled as a creditor, although Crestar was not a creditor of PQIA, and actively participated in the proceedings. Crestar received notice of the confirmation hearing. In fact, Crestar initially objected to confirmation of PQIA's Plan of Reorganization but later withdrew its opposition. As the assignee of the interests of CLAI and CLALP, which held a 99% interest in PQIA, Crestar held an interest in PQIA that was treated under the plan in Class 5. Confirmation of the plan terminated PQIA and all interests held thereto and Crestar certainly qualified as an interested party. Crestar asserts that various parties challenged its standing to object. The court, however, never ruled on that issue. Rather, Crestar withdrew its objection after comments from the other parties. In light of all of the circumstances, Crestar received reasonable notice from which it could assess the effect of the Plan on its interest and, if necessary, formally object; therefore, Crestar is bound by the plan's provisions.

Under the confirmed plan, the Bankruptcy Court for the Eastern District of Virginia decided that the Class 5 interests would receive or retain no property and that PQIA LP was terminated, as opposed to sold or exchanged. The interests, and any security interest held therein, were extinguished upon confirmation. The collateral no longer existed, therefore, Crestar neither could have a security interest in the non-existent collateral nor could there be any proceeds after termination. Having found that Crestar has no interest, the court denies the motion to prohibit the use of cash collateral.

■■■ Even if Crestar was not bound by the provisions of the confirmed plan and the Personal Services Consulting Agreement was proceeds as defined by Md.Code Ann.Comm. Law I section 9–306(1) (1992), Crestar's security interest would continue only in identifiable proceeds. Md.Code Ann.Comm.Law I section 9–306(2) (1992). Crestar argues that the Personal Services Consulting Agreement was executed in exchange for the sale of the

hotel, in which CLAI and CLALP held a 99% interest.

But Mr. Luria's Consulting Agreement was not received in exchange for only the extinguishment of the stock. The Personal Services Consulting Agreement was executed as part of a Settlement Agreement pursuant to which the Debtor relinquished various rights. In addition to the transfer of the hotel, the Debtor abandoned any cause of action he may have had against Sumitomo/Compris in other litigation; a consensual resolution of the PQIA bankruptcy was presented; the Luria parties were released from any and all obligations under the Sumitomo Luria Notes; and payments were made to Luria's attorneys. Only a portion, if any, of the consulting agreement would be consideration for the disposition of the stock. No evidence was presented from which the court could determine what amount of 1,500,000.00 value of the consulting agreement would be attributable to the transfer of the hotel. The so called "proceeds" are not identifiable, and are inseparably commingled with the consideration received by Luria for the other *quid pro quo* given by Luria as a part of the settlement. Md.Code Ann.Comm.Law I § 9–306(2) (1992).

For the reasons stated above, this court finds that the Personal Services Consulting Agreement does not satisfy the exception of 11 U.S.C. section 541(a)(6) and, therefore, is property of the estate. In addition, the court finds that the Personal Services Consulting Agreement and payments thereunder do not constitute cash collateral because Crestar does not have an interest in the agreement or its proceeds.